THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| K.K. and I.B., | CASE NO. C21-1611-JCC |
| Plaintiffs, | ORDER |
| v. | |
| PREMERA BLUE CROSS and the COLUMBIA BANKING SYSTEM, INC. BENEFITS PLAN, | |
| Defendants. | |

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 51, 54) and Defendants' motion to seal (Dkt. No. 49). Having thoroughly considered the record, the parties' briefing, and been duly advised at oral argument, the Court hereby GRANTS Defendants' motion for summary judgment (Dkt. No. 51), GRANTS Defendants' motion to seal (Dkt. No. 49) and DENIES Plaintiffs' motion for summary judgment (Dkt. No. 54) for the reasons explained herein.

## I.    BACKGROUND

K.K. and her daughter I.B. (collectively "Plaintiffs") are beneficiaries of Defendant Columbia Banking System, Inc.'s self-funded Employee Benefits Plan (the "Plan"). (*See generally* Dkt. Nos. 51, 54.) Defendant Premera Blue Cross ("Premera") is the Plan Administrator. (*Id.*) Premera denied coverage under the Plan for I.B.'s stay at the Eva Carlston

ORDER
C21-1611-JCC
PAGE - 1

Academy ("ECA"), a residential mental health treatment provider. (*Id.*) Notably, Plaintiff did not seek pre-authorization for I.B.'s treatment at ECA and, in fact, only submitted her first claim for benefits under the Plan in October 2017, more than nine months after I.B.'s admission to ECA. (*See* Dkt. No. 50 at 95.)

Prior to ECA, I.B. spent approximately two months at Pacific Quest,[1] another in-patient treatment facility. (*See* Dkt. No. 50 at 160, 188, 192.) Before I.B.'s discharge from Pacific Quest, Jason Adams, PhD performed a psychological evaluation of her. (*Id.* at 131–58.) He diagnosed I.B. with nonverbal learning disorder, generalized anxiety disorder with obsessive-compulsive features, major depressive disorder, mild alcohol use disorder, and parent-child relational problems. (*Id.* at 155.) He further indicated that, despite I.B.'s progress at Pacific Quest, it would be in her "best interest [upon discharge] to enroll in a therapeutic residential treatment program." (*Id.*) This was consistent with the recommendation of Tom Jameson, MS, NCC, I.B.'s therapist at Pacific Quest. (*Id.* at 138.) Based on these recommendations, I.B. enrolled at ECA, where she remained for approximately one year. (*See* Dkt. No. 50-4 at 313.)

Premera denied I.B. benefits for her stay at ECA, after finding that another round of residential treatment was not medically necessary, at least under the Plan.[2] (*See* Dkt. Nos. 50 at 93–122 (explanations of benefits), 50-3 at 383–84 (initial denial letter).) This was based on Premera's conclusion that I.B. could have been effectively treated for her symptoms at a lower level of care, following discharge from Pacific Quest. (Dkt. No. 50-3 at 383–84.) Plaintiffs appealed this determination, which resulted in an independent medical review and an external review, as required under state law. (*See* Dkt. Nos. 50 at 10–16, 50-3 at 387–90, 50-4 at 129–34,

---

[1] Plaintiffs contend that, before enrolling at Pacific Quest, I.B. exhibited learning disabilities and paranoia, struggled with obsessive-compulsive symptoms, attempted suicide, and engaged in acutely anti-social behavior. (Dkt. No. 54 at 5–6.)

[2] The administrative record contains multiple copies and excerpts of plan booklets. (*See* Dkt. Nos. 50-1 at 246–50; 50-3 at 393–475; 50-6 at 77–93, 1107–91.) Nothing in the briefing suggests that relevant terms vary between these documents. For this reason, the Court relies solely on the contents of the plan booklet effective January 1, 2017 located at Docket Number 50-6 at 1107–91.

50-6 at 256–57.) Those appeals upheld Premera's denial determination. (*Id.*) Plaintiffs then filed the instant complaint, which asserts causes of action under the Employee Retirement Income Security Act ("ERISA") for (a) the recovery of benefits due and (b) an alleged violation of the Mental Health Parity and Addiction Equity Act ("Parity Act"). (Dkt. No. 2 at 10–18.) Following a stipulated change in venue, (Dkt. No. 20), each party now moves for summary judgment. (Dkt. Nos. 51, 54.) Defendants also move to seal the administrative record. (Dkt. No. 49).

## II.   DISCUSSION

### A.   Legal Standard

In an ERISA case, a summary judgment motion is "the conduit to bring [the] legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999). In considering such a motion, the Court conducts a *de novo* review of a plan administrator's denial decision, "unless the plan provides to the contrary." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan grants the administrator of a self-funded plan the "discretionary authority to determine eligibility for benefits," absent a demonstrated conflict of interest, the administrator's decision is reviewed for an abuse of discretion. *Id*. A plan administrator, in turn, abuses its discretion if its decision is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). It also must engage in a "meaningful dialogue" with a plan participant seeking to appeal the decision. *Id.* (citing *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir.1997)).

### B.   Standard of Review

Plaintiffs initially argued that a *de novo* standard of review should apply to both of their claims. (*See* Dkt. No. 54 at 11.) But, as Defendants pointed out, this self-funded plan delegates "'the discretionary authority to determine eligibility for benefits and to construe the terms in this plan'" to the plan administrator—Premera. (Dkt. No. 56 at 2 (quoting Dkt. No. 50-6 at 1108); *see also* Dkt. No. 53-1 at 53 (administrative services agreement between the plan sponsor and its

administrator affording discretion to Premera).) On this basis, the delegation language controls. *See Howard W. v. Providence Health Plan*, 2023 WL 356585, slip op. at 6 n.4 (W.D. Wash. 2023). It appears that Plaintiffs have since abandoned their argument to the contrary, based both on their subsequent briefing, (*see* Dkt. No. 60-1 at 2–3), and their concession at oral argument. Therefore, the Court will review Premera's denial decision for an abuse of discretion.

But *de novo* review is warranted in assessing the Plan's and/or Premera's application of the Plan's compliance with the Parity Act, as this is a question of law. *See Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 694 (9th Cir. 1993) (interpretation of a federal statute "is a question of law subject to *de novo* review"); *see also M. S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1027 (D. Utah 2021) ("Unlike the denial of benefits claim, the court affords Defendants no deference in interpreting the Parity Act because the interpretation of a statute is a legal question"); *Howard W.*, 2023 WL 356585, slip op. at 13 (applying *de novo* standard of review to Parity Act claim). Therefore, to succeed on their second claim, Plaintiffs must show that the Plan and/or Premera's administration of the Plan violated the Parity Act. *Stone v. UnitedHealthcare Ins. Co.*, 979 F.3d 770, 774 (9th Cir. 2020)

### C.     Recovery of Benefits Claim

ERISA provides a cause of action for a denial of benefits, if not in compliance with a plan document and/or ERISA's procedural safeguards. 29 U.S.C. § 1132(a)(1)(B); *see Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 956 (9th Cir. 2016). Plaintiffs contend that Premera improperly denied benefits to I.B. for her residential treatment at ECA, given the treating providers' conclusion that such treatment was most likely to result in a favorable clinical outcome. (*See generally* Dkt. Nos. 54, 55.) At oral argument, Plaintiffs also emphasized Premera's failure to engage in a required meaningful dialogue with Plaintiffs. *See Booton*, 110 F.3d at 1463.

According to its initial denial, Premera found I.B.'s treatment at ECA not medically necessary because I.B. lacked required clinical symptoms of functional impairment for residential treatment, ECA's treatment methods failed to satisfy the Plan's guidelines, and more

generally, Plaintiffs did not establish that I.B. could not be effectively treated at a lower level of care, *i.e.*, a non-residential one. (Dkt. No. 50-3 at 383–84.)

The Plan document provides that Premera "reserves the right to deny payment for services that [we]re not medically necessary." (Dkt. No. 50-6 at 1158.) And services are "medically necessary" when they are "[c]linically appropriate, in terms of type, frequency, extent, site, and duration." (*Id.* at 1187.) The Plan document goes on to indicate that Premera had "adopted guidelines and medical policies that outline criteria used to make medical necessity determinations." (*Id.* at 1158.) These guidelines and policies included a medical policy, which Premera licensed from InterQual. (*See id.* at 765–69.) It describes clinical symptoms necessitating residential treatment, as well as treatment guidelines. (*Id.*) In addition, the Plan indicates that "[i]npatient facility services . . . will only be covered when services can't be done in a less intensive setting." (*Id.* at 1249.)

### 1. Clinical Symptoms

The InterQual criteria provide that an individual need have a serious emotional disturbance to warrant residential treatment. (Dkt. No. 50-6 at 766.) Such a disturbance must include the following components: a functional impairment, the lack of an effective support system, and severe symptoms persisting over the past six months. (*Id.*) Both Premera and subsequent reviewers found that I.B.'s medical records did not support a finding that I.B., in fact, suffered from such a serious emotional disturbance at the time of her admission to ECA. (*See* Dkt. Nos. 50-3 at 374–76, 378–81, 383–85; 50-4 at 129–345; 50-6 at 432–35.) Whether this was true is debatable.

While I.B. did improve during her time at Pacific Quest, it is speculative to conclude that this improvement would necessarily continue if she were to leave a residential therapeutic environment.[3] Prior to Pacific Quest, I.B. was unable to follow instructions or negotiate her

---

[3] To assume so reminds the Court of the infamous discussion regarding the irrationality of "throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby County, Ala. v. Holder*, 570 U.S. 529, 590 (2013) (J. Ginsburg, dissenting).

needs, engaged in a variety of acts of self-harm, demonstrated an unwillingness to regulate behavior, and could not be managed safely at home. (*See* Dkt. Nos. 50-1 at 145–46; 50-4 at 245–272, 302; 50-6 at 55–60.) That being said, the Court cannot find that Premera's decision, given I.B.'s clinical state upon completion of her time at Pacific Quest, was illogical, implausible, or without support in inferences drawn from the record—this is simply too a high bar to reach, based on the record before the Court.

Nor can the Court find that Premera's communications with Plaintiffs failed to demonstrate the required meaningful dialogue. There was no shifting rationale. At each stage, Premera communicated a consistent basis for its decision. (*See* Dkt. Nos. 50-3 at 374–76, 378–81, 383–85; 50-6 at 1086–89.) Premera's initial denial indicated that it had considered "information from your provider" and found that it failed to establish medical necessity *under the plan*. (Dkt. No. 50-3 at 383–84; *see also* Dkt. No. 50 at 191–96 (indicating that I.B. had a "dramatic improvement in her depression since going to Pacific Quest . . . no longer endorses suicidal ideation" and identifies "anxiety" as being "the most significant [current] symptom.").) While subsequent communications failed to reference the letters of medical necessity Plaintiffs submitted in support of their appeal, this is not dispositive. None of those letters engaged with the Plan's criteria for medical necessity.[4] (*See* Dkt. Nos. 50 at 127, 129; 50-1 at 145–46.) In the Court's view, Premera engaged in a meaningful dialogue with Plaintiffs.

### 2. Treatment Guidelines

The InterQual criteria also provide that, for an extended stay at a residential treatment facility such as ECA to be medically necessary, the provider must perform, *inter alia*, weekly psychiatric evaluations. (Dkt. No. 50-6 at 769.) This did not happen. (*See* Dkt. No. 50-1 at 1–170.) In fact, ECA performed only one psychiatric evaluation of I.B. over her *entire* year-long stay. (*See* Dkt. No. 50 at 191–96 (evaluation prepared by Kirk Simon, MD).) This alone is fatal to Plaintiffs' recovery of benefits claim. Without a weekly evaluation of I.B.'s ongoing need for

---

[4] Moreover, Premera was "not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

residential treatment, neither I.B.'s treating providers nor Premera could determine when medical necessity ends. Plaintiffs argued in their briefing and at oral argument that Premera did not raise this (intensity of services) issue in its initial denial and, on this basis, waived the argument. (*See* Dkt. Nos. 55 at 10–11, 60-1 at 10–11.) This is not consistent with the record before the Court. According to Premera's <u>initial denial letter</u>, one of its bases was the failure of I.B.'s medical records to demonstrate that "a psychiatric evaluation was done [at ECA] . . . at least one time per week." (*See* Dkt. No. 50-3 at 384.)

### 3. Use of InterQual Criteria

In their briefing, Plaintiffs take issue with Premera's unflinching reliance on the InterQual criteria, given the contradictory evidence suggesting that I.B's providers believed that continued residential treatment was the most effective means to deal with her mental health needs. (*See* Dkt. Nos. 54 at 12–17, 55 at 11–16.) But the Plan contemplates reliance on such criteria. (Dkt. No. 50-6 at 1158.) And Plaintiffs point to no controlling authority that the Court should disregard its application. As such, the critical issue is not the efficacy of a particular treatment, but its medical necessity under the Plan, as determined by Premera's interpretation of relevant medical guidelines. *See Weiss v. Banner Health*, 846 F. App'x 636, 641 (10th Cir. 2021). This is consistent with myriad prior holdings in this District. *See, e.g.*, *N.F. by and through M.R. v. Premera Blue Cross*, 2021 WL 4804594, slip op. at 3 (W.D. Wash. 2021); *Peter B. v. Premera Blue Cross*, 2017 WL 4843550, slip op. at 4 (W.D. Wash. 2017); *S.L. v. Premera Blue Cross*, 2023 WL 3738991, slip op. at 10 (W.D. Wash. 2023); *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, 2021 WL 2911121, slip op. at 3 (W.D. Wash. 2021). While a sister Court recently found otherwise, the case is inapt, as a *de novo* standard of review applied there—not the abuse of discretion that applies here. *See N.C. v. Premera Blue Cross*, 2023 WL 2741874, slip op. at 10–12 (W.D. Wash. 2023).

Accordingly, the Court GRANTS summary judgment to Defendants on Plaintiffs' cause of action for a recovery of benefits under ERISA.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### D.     Parity Act Claim

ERISA also provides equitable relief for a violation of any of its provisions. 29 U.S.C. § 1132(a)(3); *see Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) (describing it as a "kind of 'catchall'"). This includes a violation of the Parity Act, which prohibits, amongst other things, the imposition of disparate "treatment limitations" between mental health and medical benefits. 29 U.S.C. § 1185a(a)(3)(A); *see A.F. ex rel. Legaard v. Providence Health Plan*, 35 F. Supp. 3d 1298, 1304 (D. Or. 2014).

In an attempt to support their Parity Act claim, Plaintiffs point to differing requirements for the application of Plan benefits to residential mental healthcare versus inpatient skilled nursing care. (*See* Dkt. Nos. 55 at 20–22, 54 at 21–24.)[5] Plaintiffs label the former as requiring "acute" symptoms, with the latter as requiring only "sub-acute" symptoms. (*Id.*) But Plaintiffs created these labels. They are not employed in any meaningful way by the Plan or the Parity Act's implementing regulations. (*See generally* Dkt. Nos. 50-1 at 258–69; 50-6 at 749–908, 1107–91); 29 C.F.R. § 2590.712. For this reason, they are of no import.

The Parity Act requires that plans apply the same "processes, strategies, evidentiary standards, and other factors" to develop nonquantitative necessity criteria for both medical and behavioral coverage. 29 C.F.R. § 2590.712(c)(4)(i), (ii)(A). It does *not* require that the resulting treatment criteria be the same. This makes sense. The symptoms resulting from a behavioral disorder will vary from that of a medical disorder, as will the appropriate treatments.

An example in the implementing regulations is helpful. It indicates that a plan that applies equivalent evidentiary standards to determine the appropriate medical and mental health treatment is compliant with the Parity Act even if the resulting limitations differ. *See* 29 C.F.R. § 2590.712(c)(4)(iii) Ex. 4. All that the Parity Act requires is that the process in determining how

---

[5] For example, Plaintiffs point out that to be admitted to a skilled nursing facility, a patient must be able to actively participate in their care; whereas, for residential mental health treatment, the patient must be unable or unwilling to follow instructions. (*See* Dkt. No. 54 at 22 (citing Dkt Nos. 50-1 at 261, 50-6 at 767).)

best to treat behavioral versus medical disorders be based on a similar level of evidence and support. *See* 29 C.F.R. § 2590.712(c)(4)(i). And Plaintiffs point to no persuasive item in the record to support the notion that the Plan, or Premera in applying the Plan, employed differing processes, strategies, or evidentiary standards to develop medical necessity criteria between that required for residential mental health treatment versus skilled nursing. (*See generally* Dkt. Nos. 54, 55, 60-1.)

Plaintiffs also argue that Premera violated the Parity Act when it decided to not apply InterQual's medical necessity criteria to inpatient hospice but did apply it to residential mental health treatment. (*See* Dkt. Nos. 55 at 22–26, 54 at 24–25.) However, Plaintiffs point to nothing to suggest that the InterQual criteria is actually more stringent than the Plan language, only that they are different, *i.e.*, not "analogous." (Dkt. No. 55 at 2.) Importantly, Plaintiffs do not say *how and why* they are not analogous—just that they are not. (*See generally* Dkt. Nos. 54, 55, 60-1.). At summary judgment,[6] it is Plaintiffs' burden to make this showing. *See Stone*, 979 F.3d at 774. And they fail to do so.

The Court further notes that, in the only cases Plaintiffs cite[7] where a court actually granted summary judgment to an insured for a Parity Act violation, *Jonathan Z. v. Oxford Health Plans*, 2022 WL 2528362, slip op. (D. Utah 2022) and *M. S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1033 (D. Utah 2021), (*see* Dkt. Nos. 54 at 23 n.71, 55 at 25), those courts were ultimately unable to fashion relief for the beneficiary. *See Jonathan Z. v. Oxford Health Plans*, 2022 WL 3227909, slip op. at 4 (D. Utah 2022) (later denying appeal of administrator's decision based on standing and/or mootness); *M. S. v. Premera Blue Cross*, 2022 WL 2208927, slip op. at

---

[6] Decisions on Rule 12 motions cited by Plaintiffs have little import at this point in the instant proceeding.

[7] The Court "need only consider the cited materials" when ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c)(3)l; *see also Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) (a court need not "comb through the record to find some reason to deny a motion for summary judgment.").

1   7 (D. Utah 2022) (awarding solely statutory relief). The same appears true here.

2          Accordingly, the Court GRANTS summary judgment to Defendants on Plaintiffs' cause

3   of action for equitable relief under ERISA-based on Parity Act violations.

4          **E.      Motion to Seal Administrative Record**

5          Defendants move to seal the administrative record, (Dkt. No. 49), which contains I.B.'s

6   personal medical information. (*See* Dkt. Nos. 50, 50-1–50-6.) In general, there is a strong

7   presumption for public access to court files. *See Kamakana v. City and County of Honolulu*, 447

8   F.3d 1172, 1179 (9th Cir. 2006); LCR 5(g). A party seeking to seal a document attached to a

9   dispositive motion must provide compelling reasons "that outweigh the general history of access

10  and the public policies favoring disclosure . . . ." *Kamakana*, 447 F.3d at 1179. Here, the Court

11  FINDS that compelling confidentiality concerns regarding I.B.'s personal health records

12  outweigh the presumption of public access to the Court records.

13  **III.    CONCLUSION**

14         For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment

15  (Dkt. No. 54), GRANTS Defendants' motion for summary judgment (Dkt. No. 51), and

16  GRANTS Defendants' motion to seal (Dkt. No. 49). The Clerk is DIRECTED to maintain

17  Docket Numbers, 50, 50-1, 50-2, 50-3, 50-4, 50-5, and 50-6 under seal.

18

19         DATED this 12th day of June 2023.

20

21

22  _____

23  John C. Coughenour
    UNITED STATES DISTRICT JUDGE

24

25

26

ORDER
C21-1611-JCC
PAGE - 10